# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                    Crim. No. 08-395 (RHK/JJG)

       Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

**Chris Bronner (01), Fredrick Deshawn
Holmes (03), Kenneth Dwayne Hudson
(04), Lawrence Darryl Porter (06),
Donald Scott Schultz (08), Michael
Donjuarel Scott (09), and Courtney
Tiandre Totten (12),**

      **Defendants.**

JEANNE J. GRAHAM, United States Magistrate Judge

The above-captioned case came before the undersigned on April 2 and May 5, 2009, for

pretrial motion hearings. This case is scheduled to be tried before the Honorable Richard H.

Kyle and was referred to this Court for resolution of pretrial matters pursuant to 28 U.S.C. § 636

and District of Minnesota Local Rule 72.1. The Court will address the dispositive motions of

Defendants Chris Bronner ("Chris Bronner"), Fredrick Holmes ("Holmes"), Kenneth Hudson

("Hudson"), Lawrence Porter ("Porter"), Donald Schultz ("Schultz"), Michael Scott ("Scott"),

and Courtney Totten ("Totten") in this Report and Recommendation.[1]

## I.    PROCEDURAL HISTORY

The procedural history of this case is convoluted. The Court held the first pretrial motion

---

[1]    Defendants Antoine Killing and Demone Smith also have dispositive motions pending.
The hearings on Killing's motions occurred on May 5 and May 14, 2009, and the parties are
currently engaged in post-hearing briefing. The hearing on Smith's motions is scheduled for
June 23, 2009. The Court will issue a separate Report and Recommendation on those motions.

hearing in this case on April 2, 2009, on the pretrial motions of Chris Bronner, Holmes, Hudson, Porter, Schultz, Scott, and Totten.  At the beginning of that hearing, Chris Bronner, Hudson, and Schultz orally withdrew their dispositive motions.  One of the motions Schultz withdrew was a motion to suppress evidence seized during a warrantless vehicle search.

A few weeks later, while the parties were engaged in post-hearing briefing on other motions, the United States Supreme Court announced its decision in *Arizona v. Gant*, 129 S. Ct. 1710 (2009).  Schultz immediately moved to renew his motion to suppress evidence, based on *Gant*.  The Government did not object to the renewal of the motion and said another evidentiary hearing would be necessary to develop a complete record.  The Court set that evidentiary hearing for May 5, 2009, when Holmes' motions were scheduled to be heard.

Meanwhile, Scott filed two additional motions: a motion to dismiss the indictment on April 21, 2009; and a motion to suppress evidence, also based on *Gant*, on April 24, 2009.  The Court scheduled those motions for a hearing on May 5, 2009 as well.

At the May 5th hearing, the Court received additional testimony on the traffic stop and search of Schultz's vehicle.  No testimony was presented on Holmes' dispositive motions, and his counsel characterized those motions as moot.

The contested motions presently under consideration are Porter's Motion to Suppress Electronic Surveillance Evidence (Doc. No. 143); Schultz's Motion to Suppress Evidence as a Result of a Warrantless Vehicle Search (Doc. No. 199); Scott's Motion to Suppress Evidence Based on a Rule 5(a) Violation (Doc. No. 147);[2] Scott's Motion to Suppress Statements,

---

[2]    Scott filed a *pro se* motion for release from custody (Doc. No. 140), which asserts the same grounds as his motion to dismiss the indictment and motion to suppress for a Rule 5(a) violation, which his counsel filed.  The disposition of the *pro se* motion will correspond with that of the other two motions.

Admissions, and Answers (Doc. No. 150); Scott's Motion to Dismiss the Indictment (Doc. No. 255); and Scott's Motion to Suppress Evidence (Doc. No. 262).

## II.     Porter's Motion to Suppress Electronic Surveillance Evidence

Defendant Lawrence Porter filed a motion to suppress electronic surveillance evidence. Based on the Government's response that no such evidence exists, the motion should be denied as moot.

## III.    Scott's Motion to Suppress Based on Rule 5(a)

Scott was indicted in the District of Minnesota on December 16, 2008, with Conspiracy to Distribute Cocaine and Cocaine Base ("crack"), and with Distribution of Crack. A warrant was issued for his arrest, and he was arrested on January 6, 2009 in Wisconsin, where he was in custody on state charges. Scott made his initial appearance the next day before United States Magistrate Judge Stephen L. Crocker in the Western District of Wisconsin. A public defender appeared with Scott, acknowledged receipt of the indictment, said she had discussed the charges with Scott, and waived a reading of the indictment. Scott also waived his right to a detention hearing, implicitly conceding detention was inevitable. Not only had Scott previously been unable to make bail on the Wisconsin state charges, but he also had a pending extradition to Michigan on a homicide charge.

On January 13, 2009, Scott was transported to Minnesota and placed at the Sherburne County Jail. Due to a mistake by the United States Marshals Office, the United States Attorney's Office ("USAO") in Minnesota was not notified of his arrival. When the USAO learned that Scott had arrived in Minnesota, he was immediately scheduled for an appearance before United States Magistrate Judge Franklin Noel on February 23, 2009. A detention hearing and arraignment followed on February 25, 2009. Scott now argues that certain evidence should be

suppressed pursuant to Federal Rule of Criminal Procedure 5(a) because he was held in the Sherburne County Jail for forty-one days before he appeared before a magistrate judge in this District.

Rule 5(a)(1)(A) requires a person to be brought before a magistrate judge "without unnecessary delay" for an initial appearance. When the individual is arrested outside the district in which the offense allegedly occurred, the first appearance may be either in the district of arrest or in an adjacent district under certain circumstances. Fed. R. Crim. P. 5(c)(2). Here, Scott made his initial appearance before a magistrate judge in the Western District of Wisconsin, the district in which he was arrested, on the day after he was arrested. There was no unnecessary delay or other impropriety related to his initial appearance, and thus, no violation of Rule 5.

In addition to Rule 5(a), Scott also challenges his detention under *Corley v. United States*, 129 S. Ct. 1558, 1565-66 (2009). In *Corley*, law enforcement agents intentionally delayed a defendant's initial appearance in order to continue an interrogation. Here, however, there is simply no evidence of any delay, intentional or otherwise, between Scott's arrest and his appearance before Magistrate Judge Crocker. Nor was there any interrogation between those two events, or between his arrest and appearance before Magistrate Judge Noel. Consequently, *Corley* does not apply.

## IV.     Scott's Motion to Dismiss the Indictment

Scott also seeks dismissal of the charges against him based on the forty-one day period between his initial appearance in Wisconsin and his arraignment in Minnesota. He alleges that he was entitled to a judicial determination of probable cause by a magistrate judge before a prolonged confinement, citing *Gerstein v. Pugh*, 420 U.S. 103 (1973). Scott's reliance on *Gerstein* is misplaced, however, because he was charged by indictment, not a criminal

complaint, and thus he was not entitled to a preliminary hearing to determine probable cause. *See* Fed. R. Crim. P. 5.1(a)(2).

## V.    Schultz's Motion to Suppress Evidence and Scott's Motions to Suppress Statements and Evidence

Schultz and Scott move to suppress evidence seized from Schultz's truck during a traffic stop on February 7, 2008.  Scott also moves to suppress statements he made to sheriff's deputies during the stop.  The facts related to these motions were presented at the hearings on April 2 and May 5, 2009.  The following factual summary combines the relevant facts adduced at those two hearings.

### A.    Facts

Deputy Bren Derringer has worked for the Wood County Sheriff's Department for three years, two of those as a patrol deputy.  He has about eight total years experience as a law enforcement officer.  In the past year, Deputy Derringer has conducted approximately 400 traffic stops, and between 2,500 and 3,000 traffic stops during his law enforcement career.

On February 7, 2008, at about 6:00 p.m., Deputy Derringer was routinely patrolling Highway 10 near Marshfield, Wisconsin, when he noticed expired license plate tabs on an older model Chevrolet truck driving in front of him.  He entered the license plate number and registration information into his squad car computer and followed the truck.  As he waited for a response from the state vehicle registration database, he saw the truck cross over the yellow centerline three times.  Operating a vehicle "left of center" is a traffic violation under Wisconsin law.  Minutes later, Deputy Derringer learned that the truck's registration had expired on January 31, 2008, about a week earlier.  He decided to stop the vehicle and activated his emergency lights.  The driver of the truck activated the right blinker and pulled over to the right-hand side of

the road.

As Deputy Derringer walked toward the driver's side of the truck, he saw three people inside: the driver, later identified as Schultz; a person sitting in the front passenger seat, later identified as Kelvin Bronner ("Bronner"); and a third person lying on the backseat, later identified as Scott, who sat up as Deputy Derringer approached. Deputy Derringer spoke first with Schultz, who produced his driver's license. Schultz told the deputy he was a plumber and had been working in Eau Claire earlier that day. Deputy Derringer shined his flashlight in the truck, but did not see any plumbing tools. He mentioned this to Schultz, and Schultz explained he had not actually been working as a plumber, but had attended a plumbing conference at a Menards store in Eau Claire. Deputy Derringer doubted this, as Schultz's clothes and hair were very dirty and ungroomed, not the sort of appearance the deputy would expect at a professional conference. Deputy Derringer thus questioned Schultz further on this point, asking if vendors were present or products were displayed. Schultz said no, that the conference was about building codes.

Deputy Derringer then turned his attention to the two passengers, who appeared much cleaner and more well-dressed than Schultz, and asked if they were Schultz's employees. The back seat passenger, Scott, slid to the far side of the seat and did not respond. The front seat passenger, Bronner, told Deputy Derringer he had decided to go for a ride with Schultz because he had nothing else to do that day, and he produced a Michigan identification card upon request. Scott did not respond when Deputy Derringer initially asked him to identify himself. When asked a second time, he gave the name "Calvin Rich." Scott said he did not have any identification with him, but he did provide a date of birth. Scott explained to Deputy Derringer that he had gone with Schultz to attend the conference, but later said he had actually waited at a

6

friend's house until the conference ended. Scott changed his story again a few minutes later and said he had been staying at the friend's house before the conference, but needed to go to Stevens Point, Wisconsin, and asked Schultz for a ride.

Deputy Derringer returned to his squad car to enter the identification information of the three men. He learned that Schultz's driver's license had been revoked, but no information was returned for Scott or Bronner. In Deputy Derringer's experience, this typically means the information was false or entered incorrectly; occasionally, it means the person has never had an identification card. Deputy Derringer then contacted Deputy Robert Beathard to assist with the stop. While Deputy Derringer waited, he checked with his dispatch center, which had also been unable to find any information on "Calvin Rich."

Deputy Beathard has worked for the Wood County Sheriff's Department for more than eight years and has conducted numerous drug investigations in the context of traffic stops. He is personally involved in 300 to 400 traffic stops a year. When Deputy Beathard arrived at the scene of the traffic stop, Deputy Derringer told him that Schultz would be arrested for driving with a revoked license. He also said that the three men were telling inconsistent and implausible stories. Deputy Beathard confirmed with Scott and Bronner the identification information they had previously given Deputy Derringer, and Scott specifically told Deputy Beathard that he had a valid Michigan identification card but not with him. If an individual has an identification card, there would be information on file.

Deputy Derringer asked Schultz to step out of the truck and walked with him to an area between the truck and a patrol car. Schultz explained that Scott and Bronner were keeping him company on the drive. He admitted, however, that he did not know Bronner well and did not know Scott at all. At first, Schultz was polite and cooperative, but his demeanor noticeably

changed when the deputies told him they were going to search his truck. Deputy Derringer arrested Schultz for operating a vehicle after revocation and placed him in a patrol car.

After Schultz was arrested, the deputies continued to attempt to confirm the real identities of the two passengers. They wanted to know not only who the two men were, but also whether Scott or Bronner could drive the truck from the scene, with Schultz's permission.

Deputy Beathard asked Bronner to exit the vehicle. When asked again about the day's events, Bronner said he had decided to accompany Schultz because he was interested in working for Schultz's plumbing company. Deputy Beathard said the story was highly unlikely, and Bronner exhaled, dropped his head, and seemed overly nervous. Deputy Beathard explained to Bronner that the truck would be searched incident to Schultz's arrest, and that Bronner would have to sit in a patrol car during the search to ensure the deputies' safety. At this, Bronner's legs began shaking. Deputy Beathard searched Bronner with his consent and placed him in a patrol car.

The deputies next asked Scott to step out of the truck, which he did. The deputies explained to Scott that they were going to search the truck, due to Schultz's arrest, but first wanted to hear Scott's account of the day's events. Deputy Beathard decided to test Scott's story and offered some false details supposedly given by the other two men. Scott agreed with all of the false information.

Deputy Beathard stepped away from the conversation to search the truck. At the first motion hearing, he testified that the truck was searched incident to Schultz's arrest. At the second motion hearing, he testified to the existence of numerous indicators of drug possession, about which he has learned through years of training and experience with highway drug interdiction. These indicators were (1) Schultz's activation of the right blinker, which indicated

8

he was attempting to appear as safe as possible; (2) the inconsistent and implausible information given by Schultz, Bronner, and Scott, which appeared to be a cover story; (3) the direction of travel from a drug source city, Minneapolis/St. Paul, to a smaller community, Marshfield; (4) a two-liter bottle of Coca-Cola, an open bag of chips, and "several munchy type foods," indicative of a long trip; (5) the disparities in age and appearance between Schultz and his two passengers; (6) Schultz's dirty and disheveled appearance, which was incompatible with his claimed attendance at a professional conference; (7) the lack of any valid, noncriminal reason for the three men to be traveling together; (8) the drastic change in Schultz's demeanor when he was told of the search, which often signifies the possession of contraband; and (9) Bronner's excessively nervous behavior. Based on these indicators, Deputy Beathard believed that the three men possessed a large quantity of drugs and that Schultz was being used as a courier.

Not long after he commenced the search, Deputy Beathard found two ounces of crack cocaine hidden in the dash of the truck. He told Deputy Derringer to place Scott into custody.

### B.    Scott's Motion to Suppress Evidence

Scott argues that he is entitled to challenge the constitutionality of the traffic stop, as a passenger in Schultz's car, pursuant to *Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400 (2007). In *Brendlin*, the Supreme Court determined that a passenger in an automobile has the same standing as the driver to challenge the legality of the stop. *Id.* at 2406. The Court reasoned that because no reasonable passenger would believe he or she could leave the scene of a traffic stop without permission, the passenger is "seized" under the Fourth Amendment. *Id.* at 2406-07. This gives the passenger standing to challenge the legality of the stop as well as his or her own detention. *See id.* at 2407. Accordingly, Scott may challenge the constitutionality of the traffic stop.

9

There is no real dispute that the initial traffic stop was lawful. When a law enforcement officer observes even a minor traffic violation, he has probable cause to stop the vehicle. *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990). Deputy Derringer could have stopped the truck for either the expired registration tabs or the traffic violations.

What Scott is really asking the Court to do is to apply *Brendlin* not just to the initial traffic stop, but also to the subsequent search of the truck. *Brendlin* does not extend this far. *Brendlin* established only that a passenger can challenge the constitutionality of the initial traffic stop. It did not grant passengers a reasonable expectation of privacy in the vehicle of another so as to permit a challenge to a subsequent search of a vehicle that was lawfully stopped. In this respect, *Brendlin* did not abrogate *Rakas v. Illinois*, 439 U.S. 128 (1978), as Scott implies. Even after *Brendlin*, a passenger must have "a legitimate expectation of privacy in the particular areas of the automobile searched" before he may challenge the validity of the search, *Rakas*, 439 U.S. at 148. *Cf. United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) (deciding pre-*Brendlin* that a passenger could challenge the lawfulness of his or her own detention resulting from a traffic stop, but that a passenger's standing to challenge the lawfulness of a traffic stop does not equate to a reasonable expectation of privacy in the vehicle that was stopped). Because Scott has no reasonable expectation of privacy in Schultz's truck, he may not challenge the constitutionality of the search.

### C.    Scott's Motion to Suppress Statements

Scott seeks to suppress the statements he made to Deputy Derringer and Deputy Beathard. The Government argues that Scott was not in custody when he made the statements, and thus no *Miranda* warning was required.

The Fifth Amendment privilege against self-incrimination requires a police officer to

advise a person of his *Miranda* rights before interrogating him in a custodial setting. *Illinois v. Perkins*, 496 U.S. 292, 297 (1992). No *Miranda* warning is required before questioning a person detained in an investigatory stop made pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. McGauley*, 786 F.2d 888, 890 (8th Cir. 1986). During a *Terry* stop, an officer may ask the driver for his or her license, as well as the driver's destination and reason for being in the area. *United States v. Lyton*, 161 F.3d 1168, 1170 (8th Cir. 1998); *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995) (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994)). An officer may also ask routine questions of any passengers in the vehicle to verify the driver's information. *Johnson*, 58 F.3d at 357 (8th Cir. 1995); *see also Cummins*, 920 F.2d at 502.

In the instant case, Deputy Derringer asked Schultz routine questions such as his purpose for being in the area and his destination. Schultz originally answered that he had been working as a plumber in Eau Claire, but when Deputy Derringer noted the absence of any plumbing tools in the truck, Schultz changed his answer and said he had been at a plumbing conference all day. Deputy Derringer found the inconsistent explanations suspicious. In addition, he thought Schultz's dirty and disheveled appearance was inconsistent with his claim to have been at a professional conference. Deputy Derringer therefore asked Schultz's passengers questions to verify Schultz's information, which was entirely appropriate. *See Cummins*, 920 F.2d at 502. Scott's subsequent description of the day's events and how he came to be riding in Schultz's truck not only differed from Schultz's version, but was also internally inconsistent. "[I]f the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993). Deputy Derringer was therefore justified in

continuing to detain the three men while broadening his investigation further.

Deputy Derringer's request for Scott to identify himself did not transform the investigation into a seizure, even though it was not related to the traffic offense. *See United States v. Slater*, 411 F.3d 1003, 1004-06 (8th Cir. 2005). There is no evidence that Deputy Derringer gave an authoritative order or conveyed the message that Scott had to comply. The deputy's gun was not drawn; he was the only officer present; and he did not physically touch Scott. *See United States v. Pulliam*, 265 F.3d 736, 741 (8th Cir. 2001) (citation omitted).

When Deputy Derringer entered the identification information of the three men into a law enforcement database, he learned that Schultz's driver's license had been revoked and that there was no information on file for "Calvin Rich" or Bronner. This led Deputy Derringer to suspect that the information given by Bronner and Scott could be false, which in turn, further increased his suspicion that criminal activity could be afoot. *See United States v. Sanchez*, 417 F.3d 971, 973-74 (8th Cir. 2005). "Police officers are not required to ignore their reasonable suspicions. Rather, they are permitted 'to graduate their responses to the demands of any particular situation.'" *United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir. 1995) (quoting *United States v. Place*, 462 U.S. 696, 710 n.10 (1983)). Adapting his response to the evolving situation, Deputy Derringer decided to call Deputy Beathard to assist.

Deputy Beathard arrived a few minutes later and spoke with Schultz and Bronner before speaking with Scott. Schultz and Bronner both changed their stories slightly from before. In addition, when Schultz was told of the impending arrest and search, his demeanor changed. As for Bronner, he appeared overly nervous, and he became even more nervous after learning that Schultz's truck would be searched. Scott was questioned last. He specifically told Deputy Beathard that he had a valid Michigan identification card, which conflicted with the "not on file"

information Deputy Derringer had obtained from the police database. When a person claims to

have a valid identification card, but a search for an individual's given name yields no results, this

creates a reasonable suspicion that the person gave a false name, which is a violation of

Minnesota law. *See United States v. Cloud*, Crim. No. 06-316 (JRT/RLE), 2007 WL 128939, at

*3 (D. Minn. Jan. 16, 2007). It was therefore appropriate for the deputies to expand their

investigation to ascertain Scott's identity. *See id.* It was also permissible for the deputies to

learn whether Scott possessed a valid driver's license so that he could drive Schultz's truck, if

authorized by Schultz, from the scene. *See id.* at *12.

The deputies next asked Scott to exit the truck, which he willingly did, so that they could

ask him additional questions concerning his purpose, destination, and identity. These questions

related to the properly broadened investigation and the deputies' reasonable suspicion that

criminal activity might be underway. *See United States v. Beatty*, 170 F.3d 811, 812 (8th Cir.

1999); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). The total time from when the truck was

initially stopped until the end of this last discussion was less than forty minutes.

The Court concludes that the investigative detention was reasonable and lasted no longer

than was necessary. The facts uncovered during the investigation created a reasonable suspicion

that Schultz, Scott, and Bronner were engaged in some sort of criminal activity: at minimum, that

Scott and Bronner had provided false information to the deputies. As the situation unfolded,

Deputy Derringer and Deputy Beathard expanded the scope of their investigation accordingly,

but the extent of their investigation did not convert the *Terry* stop into a custodial detention.

Consequently, Scott's statements should not be suppressed.

### D.    Schultz's Motion to Suppress Evidence and Post-Arrest Statements

Schultz moves to suppress the cocaine seized from his truck. He and the Government

agree that the resolution of this motion will also resolve the admissibility of his post-arrest statements.

Deputy Derringer and Deputy Beathard testified at the April 2, 2009 hearing that they searched Schultz's truck incident to his arrest. During post-hearing briefing on the motion, however, the United States Supreme Court decided *Arizona v. Gant*, 129 S. Ct. 1710 (2009), which sharply limited the circumstances under which law enforcement officers may search a vehicle after arresting an occupant.

### 1. The *Gant* Decision

Acting on an informant's tip, police began investigating Rodney Gant for selling drugs. *Gant*, 129 S. Ct. at 1714. A records check showed that his driver's license was suspended and that he had an outstanding warrant for that offense. *Id.* at 1715. The police went to Gant's residence, and while they waited for him to arrive, they arrested two other people whom they placed in separate squad cars. *Id.* Gant arrived shortly thereafter. *Id.* He drove his car to the end of his driveway, parked, and exited. *Id.* One of the officers called out to Gant and intercepted him about ten feet from his car. *Id.* The officer immediately arrested Gant for driving with a suspended license, handcuffed him, and locked him in a squad car. *Id.* Two officers then searched his car incident to the arrest and found cocaine. *Id.*

Gant moved to suppress the evidence, arguing that the search-incident-to-arrest exception did not apply because he presented no threat to the officers and because there was no reason to believe that evidence of the offense of arrest would be found in his car. *Id.* The trial court ruled that the search was permissible incident to Gant's arrest, but the Arizona Supreme Court disagreed and found the search unreasonable. *Id.* The Arizona Supreme Court relied on *Chimel v. California*, 395 U.S. 752 (1969), which justifies searches incident to arrest only if necessary to

protect officer safety or to preserve evidence.  *Gant*, 129 S. Ct. at 1715-16.

The United States Supreme Court agreed with the Arizona Supreme Court by a slim 5-4 margin, holding that police may search the passenger compartment of a vehicle incident to a recent occupant's arrest only if it is reasonable to believe the arrestee could access the vehicle at the time of the search or that the vehicle contains evidence relevant to the offense of arrest.  *Id.* at 1719.  As the Court had explained in *Chimel*, "the scope of a search incident to arrest [must be] commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy."  *Id.* at 1716.  Conversely, if there is no risk that the arrestee could reach into the area to be searched, or no reason to believe the vehicle contains relevant evidence, then there is no justification to conduct a search incident to arrest.  *Id.*

The Court criticized the evolution of law in this area since *New York v. Belton*, 453 U.S. 454 (1981), was decided.  For almost thirty years, most courts have interpreted *Belton* broadly to permit vehicle searches incident to arrest even when there is no possibility that an arrestee could access the car during the search.  *Id.* at 1718-19.  The *Gant* Court found this interpretation too far removed from *Chimel*.  "[T]he Chimel rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search."  *Id.* at 1719.  The Court acknowledged, "it will be the rare case in which an officer is unable to fully effectuate an arrest so that a real possibility of access to the arrestee's vehicle remains."  *Id.* at 1719 n.4.

The *Gant* Court then turned to the specific facts before it.  Unlike *Belton*, where one officer had to manage four unsecured arrestees, the situation in *Gant* involved five officers and three arrestees, all of whom had been handcuffed and placed in separate squad cars.  *Id.* at 1719.

Thus, there was no concern for officer safety. *Id.* Nor was there a concern for preservation of evidence, as the offense of arrest was driving under suspension. *Id.* Accordingly, the search of Gant's car incident to his arrest was unreasonable. *Id.*

The Court explained that its decision would not foreclose the applicability of other exceptions to the warrant requirement "when safety or evidentiary concerns demand." *Id.* at 1721. The Court mentioned examples such as *Michigan v. Long*, 463 U.S. 1032 (1983), under which an officer may search a vehicle after forming a reasonable suspicion that a person is dangerous and could retrieve a weapon from the vehicle; *United States v. Ross*, 456 U.S. 798 (1982), which permits searches for evidence of offenses other than the offense of arrest, as long as probable cause exists; and *Maryland v. Buie*, 494 U.S. 235 (1990), which authorizes protective sweeps when an officer believes a dangerous person might be hiding in a house. *Id.*

### 2. Application of *Gant* to the Present Facts

Both Deputy Beathard and Deputy Derringer testified at the first hearing that Schultz's truck was searched incident to his arrest for driving with a revoked license. But neither deputy ever testified that Schultz was within reaching distance of the passenger compartment of the truck at the time of the search, or that they considered Schultz dangerous, or that they otherwise feared for their safety. Indeed, Schultz and Bronner had been placed in separate patrol cars at the time of the search, and the only other person at the scene, Scott, was talking with Deputy Derringer between the truck and the squad car. It was not reasonable to believe that Schultz, Scott, or Bronner might access the truck during the search.

Nor was it reasonable to believe that the truck contained evidence of the offense for which Schultz was arrested, driving with a revoked license. Deputy Derringer had already obtained Schultz's driver's license and determined it had been revoked. There was nothing

16

further to learn about this offense. *See Gant*, 129 S. Ct. at 1719 ("[W]hen a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence."). Accordingly, the Court must conclude, in accordance with *Gant*, that the search-incident-to-arrest exception to the warrant requirement cannot apply.

### 3. The Automobile Exception to the Warrant Requirement

After *Gant* was issued, the Government shifted its justification for the search of Schultz's truck from the incident-to-arrest exception to the automobile exception. Under the automobile exception to the warrant requirement, an officer may search a vehicle without a warrant if he or she has "probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004); *see also Ross*, 456 U.S. at 809. "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005) (citations omitted). The Government has the burden to establish the applicability of the exception. *Hill*, 386 F.3d at 858.

The Government argues that the deputies had probable cause to believe the truck contained evidence of drug possession based on the following actions and conduct: (1) Schultz's activation of the right blinker when he was pulled over; (2) inconsistent and implausible information given by Schultz, Bronner, and Scott; (3) the direction of travel from a drug source city to a smaller community; (4) food and drink in the truck indicative of a long trip; (5) disparities in age and appearance between Schultz and his two passengers; (6) Schultz's dirty and disheveled appearance; (7) the lack of any valid, noncriminal reason for traveling together; (8) a marked change in Schultz's demeanor when he was told his truck would be searched; and (9) Bronner's excessively nervous behavior.

Although many of the enumerated indicators appear innocent in isolation, the Court may not view each piece of information alone. *See United States v. Valle Cruz*, 452 F.3d 698, 703 (8th Cir. 2006). Rather, the Court must consider the circumstances as a whole in determining whether probable cause exists. *Id.* The Court also considers the training and experience of the deputies and will accord their inferences due weight. *See id.*

The Court concludes that while the totality of the circumstances might support a reasonable suspicion of some type of criminal activity, it is beyond the pale of probable cause to believe that Schultz's truck contained evidence of drug possession, or for that matter, any other criminal activity. The circumstances here are that Schultz was driving with expired registration tabs and properly activated his right blinker when pulled over by Deputy Derringer. He had a drink and food in his truck, and he appeared dirty and disheveled, in contrast to the appearance of his passengers. Schultz was driving in a westward direction from Eau Claire to Marshfield, Wisconsin, or in Deputy Beathard's view, from the drug source cities of Minneapolis and St. Paul toward Marshfield. When questioned, Schultz's explanation of his destination and purpose was internally inconsistent and also varied from that of his passengers. This was indeed suspicious and gave Deputy Derringer a reason to expand his investigation. When Schultz was told his truck would be searched incident to his arrest, he became upset, and Bronner appeared nervous upon hearing the same information. While the Court recognizes that the deputy's suspicions or gut instincts were correct, the Court cannot view the situation in hindsight. These circumstances, viewed cumulatively at the time of the search, do not create a *fair* probability that contraband or evidence of a crime would be found in Schultz's truck. Suspicion does not equal probable cause.

### 4.    Other Possible Exceptions

It does not appear that any other exception to the warrant requirement applies here, nor has the Government even asserted as much.  For example, *Michigan v. Long*, 463 U.S. 1032 (1983), permits a vehicle search if an officer forms a reasonable suspicion that a person is dangerous and could retrieve a weapon from the vehicle.  But neither Deputy Beathard nor Deputy Derringer testified to any such suspicion, nor was there any evidence that Schultz, Scott, or Bronner were dangerous.  Further, there was no evidence of exigent circumstances.  *See Michigan v. Tyler*, 436 U.S. 499, 509 (1978).  Finally, the Court briefly considered the inventory search exception, but no evidence was presented of a standard towing or inventory procedure, which is required for the exception to apply, *see Kennedy*, 427 F.3d at 1144.

### 5.    Conclusion

The cocaine seized from Schultz's truck should be suppressed as against Schultz because it was seized without a warrant and no exception to the warrant requirement applies.  Pursuant to the parties' agreement, Schultz's post-arrest statements should also be suppressed.


Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendant Chris Bronner's Motion for Suppression of Statements (Doc. No. 136) be terminated as **WITHDRAWN**.

2.    Defendant Chris Bronner's Motion to Exclude Eyewitness Identifications (Doc. No. 183) be terminated as **WITHDRAWN**.

3.    Defendant Fredrick Holmes' Motion to Suppress Confessions (Doc. No. 248) be **DENIED AS MOOT**.

4.      Defendant Fredrick Holmes' Motion to Suppress Evidence Obtained Through Search (Doc. No. 251) be **DENIED AS MOOT**.

5.      Defendant Fredrick Holmes' Motion to Suppress Search and Seizure Evidence (Doc. No. 252) be **DENIED AS MOOT**.

6.      Defendant Kenneth Hudson's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 160) be terminated as **WITHDRAWN**.

7.      Defendant Lawrence Porter's Motion to Suppress All Electronic Surveillance Evidence and Evidence Derived Therefrom (Doc. No. 143) be **DENIED AS MOOT**.

8.      Defendant Donald Schultz's Motion to Suppress Evidence as a Result of a Warrantless Vehicle Search (Doc. No. 199) be **GRANTED**.

9.      Defendant Donald Schultz's Motion to Renew Motion to Suppress Warrantless Automobile Search (Doc. No. 267) be **GRANTED**.

10.     Defendant Michael Scott's Motion for Release from Custody (Doc. No. 140) be **DENIED**.

11.     Defendant Michael Scott's Motion to Suppress for a Rule 5(a) Violation (Doc. No. 147) be **DENIED**.

12.     Defendant Michael Scott's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 150) be **DENIED**.

13.     Defendant Michael Scott's Motion to Dismiss Indictment (Doc. No. 255) be **DENIED**.

14.     Defendant Michael Scott's Motion to Suppress Evidence (Doc. No. 262) be **DENIED**.

Dated this 29th day of May, 2009.

s/ *Jeanne J. Graham*

_____
JEANNE J. GRAHAM
United States Magistrate Judge

## NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **June 12, 2009**. A party may respond to the objections within ten days after service thereof. Any objections or responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made. The party making the objections must timely order and file the transcript of the hearing unless the parties stipulate that the district judge is not required to review a transcript or if the district judge directs otherwise.